COPY

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA **BY FAX**

CIVIL COVER SHEET

| | |
|---|---|
| **I (a) PLAINTIFFS** (Check box if you are representing yourself ☐)<br><br>DR. RAJNIKANT KOTHARI, on Behalf of Himself, | **DEFENDANTS**<br><br>FIRST AMERICAN TITLE INSURANCE COMPANY,<br>(SEE ATTACHMENT A) |
| **(b)** County of Residence of First Listed Plaintiff (Except in U.S. Plaintiff Cases):<br>Canton, Ohio | County of Residence of First Listed Defendant (In U.S. Plaintiff Cases Only):<br>County of Orange |
| **(c)** Attorneys (Firm Name, Address and Telephone Number. If you are representing<br>yourself, provide same.)<br>Michael D. Braun (167416); BRAUN LAW GROUP, P.C.<br>12304 Santa Monica Blvd., Suite 109; Los Angeles, CA 90025<br>Tel. 310-442-7755; Fax 310-442-7756<br>(SEE ATTACHMENT B) | Attorneys (If Known) |

**II. BASIS OF JURISDICTION** (Place an X in one box only.)

☐ 1 U.S. Government Plaintiff    ☑ 3 Federal Question (U.S. Government Not a Party)

☐ 2 U.S. Government Defendant    ☐ 4 Diversity (Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES** - For Diversity Cases Only
(Place an X in one box for plaintiff and one for defendant.)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in this State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. ORIGIN** (Place an X in one box only.)

☑ 1 Original Proceeding   ☐ 2 Removed from State Court   ☐ 3 Remanded from Appellate Court   ☐ 4 Reinstated or Reopened   ☐ 5 Transferred from another district (specify):   ☐ 6 Multi-District Litigation   ☐ 7 Appeal to District Judge from Magistrate Judge

**V. REQUESTED IN COMPLAINT:**   **JURY DEMAND:** ☑ Yes   ☐ No (Check 'Yes' only if demanded in complaint.)

**CLASS ACTION under F.R.C.P. 23:** ☑ Yes  ☐ No    ☑ **MONEY DEMANDED IN COMPLAINT:** $ Unknown at this time.

**VI. CAUSE OF ACTION** (Cite the U.S. Civil Statute under which you are filing and write a brief statement of cause. Do not cite jurisdictional statutes unless diversity.)
28 U.S.C. §§ 1331 and 1337.

**VII. NATURE OF SUIT** (Place an X in one box only.)

| OTHER STATUTES | CONTRACT | TORTS PERSONAL INJURY | TORTS PERSONAL PROPERTY | PRISONER PETITIONS | LABOR |
|---|---|---|---|---|---|
| ☐ 400 State Reapportionment | ☐ 110 Insurance | ☐ 310 Airplane | ☐ 370 Other Fraud | ☐ 510 Motions to Vacate Sentence Habeas Corpus | ☐ 710 Fair Labor Standards Act |
| ☑ 410 Antitrust | ☐ 120 Marine | ☐ 315 Airplane Product Liability | ☐ 371 Truth in Lending | | ☐ 720 Labor/Mgmt. Relations |
| ☐ 430 Banks and Banking | ☐ 130 Miller Act | ☐ 320 Assault, Libel & Slander | ☐ 380 Other Personal Property Damage | ☐ 530 General | ☐ 730 Labor/Mgmt. Reporting & Disclosure Act |
| ☐ 450 Commerce/ICC Rates/etc. | ☐ 140 Negotiable Instrument | ☐ 330 Fed. Employers' Liability | ☐ 385 Property Damage Product Liability | ☐ 535 Death Penalty | ☐ 740 Railway Labor Act |
| ☐ 460 Deportation | ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 340 Marine | **BANKRUPTCY** | ☐ 540 Mandamus/ Other | ☐ 790 Other Labor Litigation |
| ☐ 470 Racketeer Influenced and Corrupt Organizations | | ☐ 345 Marine Product Liability | ☐ 422 Appeal 28 USC 158 | ☐ 550 Civil Rights | ☐ 791 Empl. Ret. Inc. Security Act |
| ☐ 480 Consumer Credit | ☐ 151 Medicare Act | ☐ 350 Motor Vehicle | ☐ 423 Withdrawal 28 USC 157 | ☐ 555 Prison Condition | **PROPERTY RIGHTS** |
| ☐ 490 Cable/Sat TV | ☐ 152 Recovery of Defaulted Student Loan (Excl. Veterans) | ☐ 355 Motor Vehicle Product Liability | **CIVIL RIGHTS** | **FORFEITURE / PENALTY** | ☐ 820 Copyrights |
| ☐ 810 Selective Service | | ☐ 360 Other Personal Injury | ☐ 441 Voting | ☐ 610 Agriculture | ☐ 830 Patent |
| ☐ 850 Securities/Commodities /Exchange | ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 362 Personal Injury-Med Malpractice | ☐ 442 Employment | ☐ 620 Other Food & Drug | ☐ 840 Trademark |
| ☐ 875 Customer Challenge 12 USC 3410 | ☐ 160 Stockholders' Suits | ☐ 365 Personal Injury-Product Liability | ☐ 443 Housing/Acco-mmodations | ☐ 625 Drug Related Seizure of Property 21 USC 881 | **SOCIAL SECURITY** |
| ☐ 890 Other Statutory Actions | ☐ 190 Other Contract | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 444 Welfare | | ☐ 861 HIA (1395ff) |
| ☐ 891 Agricultural Act | ☐ 195 Contract Product Liability | | ☐ 445 American with Disabilities - Employment | ☐ 630 Liquor Laws | ☐ 862 Black Lung (923) |
| ☐ 892 Economic Stabilization Act | ☐ 196 Franchise | | ☐ 446 American with Disabilities - Other | ☐ 640 R.R. & Truck | ☐ 863 DIWC/DIWW (405(g)) |
| ☐ 893 Environmental Matters | **REAL PROPERTY** | | ☐ 440 Other Civil Rights | ☐ 650 Airline Regs | ☐ 864 SSID Title XVI |
| ☐ 894 Energy Allocation Act | ☐ 210 Land Condemnation | | | ☐ 660 Occupational Safety /Health | ☐ 865 RSI (405(g)) |
| ☐ 895 Freedom of Info. Act | ☐ 220 Foreclosure | | | ☐ 690 Other | **FEDERAL TAX SUITS** |
| ☐ 900 Appeal of Fee Determination Under Equal Access to Justice | ☐ 230 Rent Lease & Ejectment | | | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) |
| ☐ 950 Constitutionality of State Statutes | ☐ 240 Torts to Land | | | | ☐ 871 IRS-Third Party 26 USC 7609 |
| | ☐ 245 Tort Product Liability | | | | |
| | ☐ 290 All Other Real Property | | | | |

**VIII(a). IDENTICAL CASES:** Has this action been previously filed and dismissed, remanded or closed? ☑ No   ☐ Yes

If yes, list case number(s):

**FOR OFFICE USE ONLY:**   Case Number:   **SACV08-00440 DOC (RNBx)**

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA
CIVIL COVER SHEET

AFTER COMPLETING THE FRONT SIDE OF FORM CV-71, COMPLETE THE INFORMATION REQUESTED BELOW.

VIII(b).  RELATED CASES: Have any cases been previously filed that are related to the present case? ☐ No    ☑Yes

If yes, list case number(s): 08-CV-1897 DSF

Civil cases are deemed related if a previously filed case and the present case:

(Check all boxes that apply)  ☑A.  Arise from the same or closely related transactions, happenings, or events; or
☑B.  Call for determination of the same or substantially related or similar questions of law and fact; or
☑C.  For other reasons would entail substantial duplication of labor if heard by different judges; or
☐D.  Involve the same patent, trademark or copyright, and one of the factors identified above in a, b or c also is present.

IX. VENUE: List the California County, or State if other than California, in which EACH named plaintiff resides (Use an additional sheet if necessary)
☐ Check here if the U.S. government, its agencies or employees is a named plaintiff.

Plaintiff Rajnikant Kothari is a resident of Canton, Ohio.

List the California County, or State if other than California, in which EACH named defendant resides. (Use an additional sheet if necessary).
☐  Check here if the U.S. government, its agencies or employees is a named defendant.

Defendant First American Title Insurance Company's principal place of business is located in the County of Orange;
Fidelity National Title Insurance Company, Florida
Chicago Title Insurance Company, Florida
(SEE ATTACHMENT C)

List the California County, or State if other than California, in which EACH claim arose. (Use an additional sheet if necessary)
Note: In land condemnation cases, use the location of the tract of land involved.

County of Orange.

X.  SIGNATURE OF ATTORNEY (OR PRO PER): _____        Date _____4/23/2008_____

Notice to Counsel/Parties:  The CV-71 (JS-44) Civil Cover Sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law.  This form, approved by the Judicial Conference of the United States in September 1974, is required pursuant to Local Rule 3-1 is not filed but is used by the Clerk of the Court for the purpose of statistics, venue and initiating the civil docket sheet.  (For more detailed instructions, see separate instructions sheet.)

Key to Statistical codes relating to Social Security Cases:

| Nature of Suit Code | Abbreviation | Substantive Statement of Cause of Action |
| --- | --- | --- |
| 861 | HIA | All claims for health insurance benefits (Medicare) under Title 18, Part A, of the Social Security Act, as amended. Also, include claims by hospitals, skilled nursing facilities, etc., for certification as providers of services under the program. (42 U.S.C. 1935FF(b)) |
| 862 | BL | All claims for "Black Lung" benefits under Title 4, Part B, of the Federal Coal Mine Health and Safety Act of 1969. (30 U.S.C. 923) |
| 863 | DIWC | All claims filed by insured workers for disability insurance benefits under Title 2 of the Social Security Act, as amended; plus all claims filed for child's insurance benefits based on disability. (42 U.S.C. 405(g)) |
| 863 | DIWW | All claims filed for widows or widowers insurance benefits based on disability under Title 2 of the Social Security Act, as amended. (42 U.S.C. 405(g)) |
| 864 | SSID | All claims for supplemental security income payments based upon disability filed under Title 16 of the Social Security Act, as amended. |
| 865 | RSI | All claims for retirement (old age) and survivors benefits under Title 2 of the Social Security Act, as amended. (42 U.S.C. (g)) |

# **ATTACHMENT A TO CIVIL COVER SHEET**

FIDELITY NATIONAL TITLE INSURANCE COMPANY, CHICAGO TITLE
INSURANCE COMPANY, TICOR TITLE INSURANCE COMPANY,
FIDELITY NATIONAL FINANCE, INC., UNITED GENERAL TITLE
INSURANCE COMPANY, FIRST AMERICAN CORPORATION,
COMMONWEALTH LAND TITLE INSURANCE COMPANY, LAWYERS
TITLE INSURANCE CORPORATION, LANDAMERICA FINANCIAL
GROUP, INC., STEWART TITLE GUARANTY COMPANY, and STEWART
TITLE INSURANCE COMPANY,

Defendants.

# ATTACHMENT B TO CIVIL COVER SHEET

Loren Kieve
KIEVE LAW OFFICES
50 California Street, Suite 1500
San Francisco, CA 94111
Tel:   (415) 364-0060
Fax:   (415) 439-5377
E-mail:  lk@kievelaw.com

Christopher J. Gray
LAW OFFICE OF CHRISTOPHER J. GRAY, P.C.
460 Park Avenue, 21ST Floor
New York, NY 10022
Tel:   (212) 838-3221
Fax:   (212) 508-3695
E-mail:  gray@cjgraylaw.com

Krishna B. Narine
LAW OFFICE OF KRISHNA B. NARINE
2600 Philmont Avenue
Huntingdon Valley, PA 19006
Tel:   (215) 914-2460
Fax:   (215) 914-2462
E-mail: knarine@kbnlaw.com

Louis F. Burke
E-mail: lburke@lfblaw.com
Leslie Wybiral
E-mail:  ewybiral@lfblaw.com
LOUIS F. BURKE, P.C.
460 Park Avenue, 21ST Floor
New York, NY 10022
Tel:   (212) 682-1700
Fax:   (212) 808-4280

Samuel D. Edwards
E-mail:  sedwards@sselaw.com
Kirk G. Smith
E-mail:  ksmith@sselaw.com
SHEPHERD SMITH & EDWARDS LLP
1010 Lamar Street,  Suite 900
Houston, TX 77002
Tel:   (713) 227-2400
Fax:   (713) 227-7215

**Counsel for Plaintiff**

# ATTACHMENT C TO CIVIL COVER SHEET

Ticor Title Insurance Company, Florida
Fidelity National Finance, Inc., Florida
United General Title Insurance Company, Colorado
First American Corporation, County of Orange
Commonwealth Land Title Insurance Company, Virginia
Lawyers Title Insurance Corporation, Virginia
Landamerica Financial Group, Inc., Virginia
Stewart Title Guaranty Company, Texas and
Stewart Title Insurance Company, New York

COPY



1   Michael D. Braun (167416)
    BRAUN LAW GROUP, P.C.
2   12304 Santa Monica Blvd., Suite 109
    Los Angeles, CA 90025
3   Tel:   (310) 442-7755
    Fax:   (310) 442-7756
4   E-mail:  service@braunlawgroup.com

5   **Liaison Counsel for Plaintiff**

6   Loren Kieve (56280)                          Christopher J. Gray
    KIEVE LAW OFFICES                            LAW OFFICE OF CHRISTOPHER J.
7   50 California Street, Suite 1500             GRAY, P.C.
    San Francisco, CA 94111                      460 Park Avenue, 21ST Floor
8   Tel:   (415) 364-0060                        New York, NY 10022
    E-mail: lk@kievelaw.com                      Tel:   (212) 838-3221
9                                                E-mail: gray@cjgraylaw.com

10  **Counsel for Plaintiff**
    **[Additional counsel listed on signature page]**
11
                      **UNITED STATES DISTRICT COURT**
12
                      **CENTRAL DISTRICT OF CALIFORNIA**
13

14  DR. RAJNIKANT KOTHARI, on          )   CASE NO.:  SACV08-00440 DOC (RNBx)
    Behalf of Himself,                 )
15                                     )   **CLASS ACTION**
                       Plaintiff,      )
16                                     )   **CLASS ACTION COMPLAINT**
         vs.                           )
17                                     )
    FIRST AMERICAN TITLE               )   **JURY TRIAL DEMANDED**
18  INSURANCE COMPANY,                 )
    FIDELITY NATIONAL TITLE            )
19  INSURANCE COMPANY,                 )
    CHICAGO TITLE INSURANCE            )
20  COMPANY, TICOR TITLE               )   **BY FAX**
    INSURANCE COMPANY,                 )
21  FIDELITY NATIONAL FINANCE,         )
    INC., UNITED GENERAL TITLE         )
22  INSURANCE COMPANY, FIRST           )
    AMERICAN CORPORATION,              )
23  COMMONWEALTH LAND TITLE            )
    INSURANCE COMPANY,                 )
24  LAWYERS TITLE INSURANCE            )
    CORPORATION, LANDAMERICA           )
25  FINANCIAL GROUP, INC.,             )
    STEWART TITLE GUARANTY             )
26  COMPANY, and STEWART TITLE         )
    INSURANCE COMPANY,                 )
27                                     )
                       Defendants.     )
28  _____)

1  Plaintiff Dr. Rajnikant Kothari ("plaintiff"), on behalf of himself and all others
2  similarly situated, upon knowledge with respect to his own acts and upon
3  information and belief with respect to all other matters, alleges as follows:

4  1.  Plaintiff brings this action under Section 1 of the Sherman Act and the
5  statutes of the State of California to enjoin defendants' illegal price-fixing activity
6  and recover damages for the illegal overcharges the Class has paid in connection
7  with the unlawful activity by defendants alleged herein.

8  **JURISDICTION AND VENUE**

9  2.  Plaintiff brings this action under Section 16 of the Clayton Act, 15
10 U.S.C. § 26, to prevent and restrain violations of Section 1 of the Sherman Act, 15
11 U.S.C. § 1, and for damages under Section 4 of the Clayton Act, 15 U.S.C. § 15.
12 This Court has jurisdiction under 28 U.S.C. §§ 1331 and 1337.

13 3.  Venue is proper in this judicial district under 28 U.S.C. § 1391(b) and
14 15 U.S.C. § 22 because each defendant is a corporation that is found or transacts
15 business in this district, and because a substantial portion of the affected trade and
16 commerce described herein has been carried out in this district.

17 4.  The violations of antitrust law alleged herein have substantially affected
18 interstate commerce.  Defendants sell title insurance throughout the United States
19 collecting billions of dollars in premiums annually.

20 **THE PARTIES**

21 5.  Plaintiff is a resident of Canton, Ohio.  During the Class Period as
22 hereinafter defined plaintiff purchased title insurance at a price that was artificially
23 high because of defendants' unlawful price-fixing agreement.

24 6.  The Fidelity family of title insurance companies (collectively,
25 "Fidelity")-- which includes defendant Fidelity National Title Insurance Co.
26 ("Fidelity Title"), defendant Chicago Title Insurance Company ("Chicago Title"),
27 defendant Ticor Title Insurance Company ("Ticor Title"), and their affiliates – is
28 engaged in selling title insurance to purchasers of commercial and residential real

1

1   estate throughout the United States, including California.   Nationally, Fidelity
2   accounts for approximately 27 percent of title premiums, which in 2006 amounted to
3   roughly $4.6 billion.  Fidelity Title, Chicago Title, and Ticor Title were founding
4   members of TIRSA (as discussed below).

5       7.      Fidelity Title, Chicago Title, Ticor Title, and their affiliates are wholly-
6   owned and controlled by defendant Fidelity National Finance, Inc. ("Fidelity
7   National"), a Delaware corporation headquartered in Jacksonville, Florida.  Through
8   its subsidiaries, Fidelity National is a provider of title insurance, specialty insurance,
9   and claims management services.  Fidelity engaged in the conduct challenged herein
10  with the approval and assent of Fidelity National.

11      8.      The First American family of title insurance companies (collectively,
12  "First American") – which includes defendant First American Title Insurance
13  Company ("First American Title") and defendant United General Title Insurance
14  Company ("United General Title"), and their affiliates – is engaged in selling title
15  insurance to purchasers of commercial and residential real estate throughout the
16  United States, including California.   Nationally, First American accounts for
17  approximately 29 percent of title premiums, which in 2006 amounted to roughly $4.8
18  billion.  First American Title and United General Title were founding members of
19  TIRSA.

20      9.      First American Title, United General Title, and their affiliates are
21  wholly-owned and controlled by defendant First American Corporation ("FAC"), a
22  California corporation headquartered in Santa Ana, California.  Through its
23  subsidiaries, FAC is a provider of title insurance, business information, and related
24  products and services.  FAC had 2006 revenues of roughly $8.5 billion.  First
25  American engaged in the conduct challenged herein with the approval and assent of
26  FAC.

27
28

2

1    10.    The LandAmerica family of title insurance companies (collectively,

2    "LandAmerica") – which includes defendant Commonwealth Land Title Insurance

3    Company ("Commonwealth"), defendant Lawyers Title Insurance Corporation

4    ("Lawyers Title"), and their affiliates – is engaged in selling title insurance to

5    purchasers of commercial and residential real estate throughout the United States,

6    including California.  Nationally, LandAmerica accounts for approximately 19

7    percent of title premiums, which in 2006 amounted to roughly $3.15 billion.

8    Commonwealth and Lawyers Title were founding members of TIRSA.

9    11.    Commonwealth and Lawyers Title are wholly-owned and controlled by

10    defendant LandAmerica Financial Group, Inc.  ("LAFG"), a Virginia corporation

11    headquartered in Glen Allen, Virginia.  Through its subsidiaries, LAFG is a provider

12    of title insurance and other products and services that facilitate the purchase, sale,

13    transfer, and financing of residential and commercial real estate.  LAFG had 2006

14    revenues of roughly $4 billion.  LandAmerica engaged in the conduct challenged

15    herein with the approval and assent of LAFG.

16    12.    The Stewart family of title insurance companies (collectively,

17    "Stewart") – which includes defendant Stewart Title Guaranty Company and,

18    defendant Stewart Title Insurance Company, and their affiliates – is engaged in

19    selling title insurance to purchasers of commercial and residential real estate

20    throughout the United States, including California.  Nationally, Stewart accounts for

21    approximately 12 percent of title premiums, which in 2006 amounted to roughly $2

22    billion.  Stewart was a founding member of TIRSA.

23    13.    Together, Fidelity, First American, LandAmerica and Stewart account

24    for more than 85 percent of title premiums in the United States, which in 2006

25    amounted to roughly $14.5 billion.

26    ///

27    ///

28    ///

3

1      14.    Significant nonparty TIRSA is a voluntary association of title insurers
2 licensed as a rate service organization pursuant to Article 23 of the Insurance Law of
3 the State of New York.  TIRSA maintains its offices in New York City, which until
4 recently were located at the same New York address of defendant Fidelity Title.

5      15.    TIRSA annually compiles from its members statistical data relating to
6 their title insurance premiums, losses and expenses and submits this information in
7 aggregate form to the New York Insurance Department.  TIRSA also prepares and
8 submits the New York Title Insurance Rate Manual which sets forth title rates to be
9 charged and rules to be followed by TIRSA's members.  The Insurance Department
10 has never objected to any of the rates TIRSA has collectively set.

11      16.    TIRSA's membership is comprised of defendant insurers and all other
12 title insurers that are licensed to issue policies in New York.  Currently, Fidelity,
13 First American, LandAmerica, and Stewart collectively represent 14 of TIRSA's 22
14 members.  As such, they comprise a majority voting block which, according to
15 TIRSA's by-laws, allows them to control the operations of TIRSA and, in particular,
16 TIRSA's collective rate setting activity.

17 **DETAILED FACTUAL ALLEGATIONS**

18 A.    The Business of Title Insurance

19      17.    Title insurance serves an important purpose.  It protects the purchaser of
20 a property from any unidentified defects in the title that would in any way interfere
21 with the full and complete ownership and use of the property and with the ultimate
22 right to resell the property.  Title insurance is required by lenders in most residential
23 and commercial real estate transactions.

24      18.    Despite the importance and high cost of title insurance, consumers have
25 little understanding of the product, the purpose it serves, and the reasonableness of
26 the price they pay for it.  They also exercise little discretion in choosing the title
27 insurer from which they purchase the insurance.  That decision is typically made for
28 them by their lawyer, mortgage broker, lender, or realtor.  Consequently, for most

4

1  purchasers, the cost of title insurance is largely overlooked and seldom, if ever,
2  challenged. Most consumers do not even become aware of the price they will pay
3  and to which insurer they will pay it until the actual closing of the real estate
4  transaction. Usually the consumer does not "shop around" or negotiate with respect
5  to the price of the insurance coverage.

6      19.    Due to this lack of a competitive environment, title insurers have little
7  or no incentive to compete with respect to price.

8      20.    The most effective way for a particular title insurer to get business is to
9  encourage those making the purchasing decisions – typically lawyers, brokers or
10 lenders servicing a customer – to steer business to that insurer. One way to so
11 motivate these third-party representatives is through kickbacks in the form of
12 finder's fees, gifts, and other financial enticements. Therefore, it is higher pricing
13 (which allows for payments to referring parties), not lower pricing or competing on
14 the basis of price, that provides the best way for title insurers to compete and
15 increase their business.

16     21.    Premiums for title insurance cover both the risk of loss to the
17 underwriter and "agency commissions." Unlike property insurance, title insurance
18 carries with it a very limited risk of loss to the insurer. That is because the title
19 insurance protects against *prior* events that cause defects in title. With a proper
20 search and examination of prior ownership records, any such defects can and almost
21 always are readily identified and excluded from the policy's coverage.
22 Consequently, the average claim payout on a title insurance policy amounts to only
23 about 5 percent of the total premium collected.    This is very different from property
24 coverage (such as auto and home insurance) – which protects against *future*
25 occurrences over which the insurer has little to no control – where the average claim
26 payout amounts to about 80 percent of the total premium.

27
28

1    22.    The "agency commissions" component of the title insurance rate covers
2    payments made to title agents. Defendants have an ownership or management stake
3    in many of the title agencies to which these payments are made. A small portion of
4    these payments is for the search and exam of prior ownership records of the property
5    being purchased to identify any liens, encumbrances, burdens, exclusions, or other
6    defects in the title. The search and exam function does not involve the spreading or
7    underwriting of risk and title insurers typically outsource this task to title agents.

8    23.    The remainder, and by far the bulk, of the agency commissions are
9    comprised of costs unrelated to the issuance of title insurance. These costs include
10   kickbacks and other financial inducements title insurers provide to title agents and
11   indirectly (through title agents) to the lawyers, brokers, and lenders who, in reality,
12   are the ones deciding which title insurer to use. These payments have nothing to do
13   with the issuance of title insurance and are made by title insurers merely to inflate
14   their revenues and steer business their way.

15   24.    Under TIRSA's collective rate setting regime, roughly 85 percent of the
16   total title insurance premium is based on the so-called "costs" associated with the
17   payment of agency commissions. Only 15 percent is based on costs associated with
18   the risk of loss. TIRSA publishes its final calculated title rates in the New York
19   Title Insurance Rate Manual. These rates are tied to the value of the property being
20   insured. This is so despite the fact that the costs associated with agency
21   commissions are entirely unrelated to the value of the property. Indeed, agency
22   kickbacks and enticements have little to do with producing a particular title policy
23   and provide no value – proportional to property value or otherwise – to the
24   consumer. Even search and exam costs are unrelated to property value. They instead
25   depend on the age of the property, the complexity of the ownership history, and the
26   accessibility of prior ownership records.

27

28

6

1    B.    TIRSA

2        25.    Prior to TIRSA, the New York Board of Title Underwriters ("NYBTU")

3    served as the title insurance rate-setting body in New York.  NYBTU, along with the

4    title insurance rate setting bureaus in many other states, was disbanded in the mid-

5    1980's in the wake of a Federal Trade Commission ("FTC") challenge to the

6    collective rate setting activity of many of these associations.  The FTC's challenge

7    culminated in *FTC v. Ticor Title Ins. Co.*, 504 U.S. 621 (1992), where the Supreme

8    Court held that to avoid *per se* illegal price fixing liability, the rate setting activity of

9    these rating bureaus must be actively supervised by the state.

10        26.    In *Ticor*, like here, the FTC focused its challenge on agency

11    commissions.  The FTC contended that the respective state insurance departments

12    merely rubber-stamped this portion of the collectively fixed rates without any

13    independent review or analysis of their reasonableness or cost justification.  The

14    Supreme Court agreed with the FTC that this kind of limited state oversight was not

15    sufficient.  Rather, to avoid illegal price-fixing liability, the state insurance

16    department has to "exercise[] sufficient independent judgment and control so that the

17    details of the rates or prices have been established as a product of deliberate state

18    intervention, not simply by agreement among private parties."  *Ticor*, 504 U.S. at

19    634-35.

20        27.    Following the Supreme Court's instruction in *Ticor*, the Third Circuit on

21    remand in *Ticor Title Ins. Co. v. FTC*, 998 F. 2d 1129 (3d Cir. 1993), upheld the

22    FTC's finding that the collective rate-setting of certain state rating bureaus was

23    improper because it was not actively supervised by the state.  According to the circuit

24    court, "[t]he Supreme Court plainly instructed us that a state's rubber stamp is not

25    enough.  Active supervision requires the state regulatory authorities' independent

26    review and approval." *Id*. at 1139.

27

28

1    28.    Defendants formulated TIRSA's first rate manual and procedure soon
2    after the Supreme Court's *Ticor* decision. Through TIRSA, defendants have set up a
3    rate-setting scheme to get around the rigors of state oversight required by *Ticor*.
4    They have done so by calculating a single rate that comprises both risk and agency
5    commission costs and by outsourcing to title agents the agency commission costs.  In
6    this way, defendants avoid providing the Insurance Department with any detailed
7    breakout or backup for the bulk of the costs that make up their collectively fixed
8    rates.

9    29.    TIRSA merely submits an aggregated figure that is supposed to
10   represent the total agency commission costs.  Embedded within this figure is the vast
11   quantity of dollars that are funneled to and through the title agencies as kickbacks,
12   financial inducements and other costs unrelated to the issuance of title insurance.
13   Defendants' design in all of this has been to effectively "hide" the cost basis for their
14   artificially high and collectively fixed title insurance premiums from the regulatory
15   scrutiny that *Ticor* demands.

16   30.    There is no provision under the Insurance Law for TIRSA to include in
17   its collectively fixed rates kickbacks and other agency commission payments
18   unrelated to the issuance of title insurance.  Indeed, the Insurance Department has
19   publicly stated that it lacks the authority to review any agency commission payments.
20   It has likewise recognized that defendants' outsourcing of agency commission costs
21   has prevented it from performing a meaningful review of TIRSA's calculated rates.
22   This was made clear at a November 2006 public hearing the Insurance Department
23   held – the first in 15 years – where it questioned TIRSA and its members on
24   TIRSA's failure to provide the Insurance Department with any backup or detail for
25   agency commissions.  Further, at the hearing the Insurance Department conceded
26   that it could not properly evaluate TIRSA's rates without access to detailed
27   information concerning agency commissions that TIRSA does not provide.

28

8

31.    The Insurance Department's recognition that it is not properly supervising TIRSA's rate-setting activity is consistent with the April 2007 findings of the U.S. Government Accountability Office ("GAO") that the title insurance industry is in dire need of greater state regulation.  The GAO studied the industry conditions of several states, including New York, and concluded that "state regulators have not collected the type of data, *primarily on title agents' costs and operations*, needed to analyze premium prices and underlying costs." (emphasis added)

32.    To remedy this failing, GAO has proposed, among other things: 1) strengthening the regulation of title agents through means such as establishing meaningful requirements of capitalization, licensing, and continuing education; and 2) improving the oversight of title agents through more detailed audits and the collection of data that would allow in-depth analyses of agents' costs and revenues.

33.    Unchecked by regulatory review and insulated from competition, defendants have thus been able to collectively fix title insurance rates at supracompetitive levels and earn profits in New York that vastly exceed those contemplated by the Insurance Department or that would have resulted in a free and lawfully operating competitive market.

C.    Defendants' Agreement Not to Compete
       on The Price of Title Insurance in California

34.    The title insurance market in California consists of a dozen carriers, ranging in size from regional companies to national affiliates.  However, the market is dominated by four groups of affiliated companies which, combined, sell over 90 percent of the title insurance policies sold in California and which own and control the title plants in many California counties that every title insurer must rely on in order to issue title policies.

1    35.    Title companies, in marked contrast to property, casualty, life and other
2  traditional insurance carriers, choose not to market their products directly to the
3  consumers who pay for them.  Instead, the title insurance industry operates on what
4  is termed a "reverse competition"  mode.  Reverse competition means that title
5  companies solicit business referrals from the other major players in the home
6  purchase scenario - real estate agents and agencies, banks, lenders, builders,
7  developers and others: middlemen or go-betweens. The title companies pay
8  middlemen for these referrals in the form of direct payments, advertising expenses,
9  junkets, parties and other kick-backs and inducements.

10    36.    Reverse competition, as the term suggests, isn't a model that benefits
11  consumers through market-driven forces.  In fact, consumers are bypassed
12  completely as title companies spend nearly all of their marketing budgets "wining
13  and dining" real estate agents, banks, lenders, builders, developers and others in an
14  effort to convince these middlemen to steer their home-buying clients to their
15  companies for their title insurance needs.

16    37.    In some of the major markets in the United States, these same title
17  insurers collectively meet, and jointly set rates and file these rates with the applicable
18  state insurance authority. The rates are not subject to any meaningful review or
19  regulation.  The companies agree to fix the price of title insurance far in excess of the
20  risk and loss experience associated with such insurance.  As a result of the joint
21  agreement as to rates, competition is relegated to the middleman.

22    38.    As a result of their joint rate setting and agreement, no company
23  competes on price to the consumer.

24    39.    Having agreed to fix prices in states where joint rate setting occurs, the
25  companies agreed to not compete based on price to the consumer in other states,
26  including California, where regulation of filed rates is lax or non-existent. Thus, they
27  agreed to set rates at supracompetitive prices and to compete based on offering
28  inducements to middlemen.

1     40.    In California, in three successive reports, the Office of the Insurance
2  Commissioner ("OIC") has found an "astonishing number" of such inducements that
3  are in violation of state law. However,  the OIC does not actively oversee or regulate
4  rates, and, in fact, does not by its own admission have the power to do so. The
5  absence of regulation has allowed collusive behavior and excessive rates.

6     41.    In addition to paying inducements and kick-backs, the title companies
7  and their agents divide the market of real-estate middlemen through the use of
8  Affiliated Business Arrangements ("ABAs"), wherein the dominant real estate
9  brokers purchase significant ownership stakes in favored title insurance affiliates.
10 The real estate brokers then reward their associates for using the preferred title
11 insurance providers and lock-out independent title insurers.

12    42.    The GAO visited several states, including California, and found a lack
13 of regulatory oversight, as stated in a report:

14         In the states we visited, we found that regulators did not assess title
15         agents' costs to determine whether they were in line with premium
16         rates; had made only limited efforts to oversee title agents (including
17         ABAs involving insurers and agents); and, until recently, had taken
18         few actions against alleged violations of antikickback laws. In part,
19         this situation has resulted from a lack of resources and limited
20         coordination among different regulators within states. On the federal
21         level, authority for alleged violations of section 8 of RESPA,
22         including those involving increasingly complex ABAs, is limited to
23         seeking injunctive relief. Some state regulators expressed frustration
24         with HUD's level of responsiveness to their requests for help with
25         enforcement, and some industry officials said that RESPA rules
26         regarding ABAs and referral fees need to be clarified. Industry and
27         government stakeholders have proposed several regulatory changes,
28         including RESPA reform, strengthened regulation of agents, a

1    competitor right of action with no monetary penalty, and alternative

2    title insurance models.

3

4    43.    Having agreed to fix or stabilize prices in New York and other states

5    where they covertly meet to promulgate rates, these same defendants then set out to

6    do the same in other states.   In other words, as a direct result of these meetings

7    where rates were agreed to, these same defendants agreed, either expressly or tacitly,

8    not to compete on rates in other states as well.   To compete on rates in other states

9    could and would imperil their ability to maintain the agreed rate in states like New

10    York.

11    44.    As is the case in New York, a lack of regulatory authority over rates

12    created an environment in which a conspiracy can and did succeed.   No agency was

13    examining why all the rates were virtually identical, and no agency was examining

14    whether the costs associated with these premiums were reasonable.   This is an

15    environment that  is conducive to price fixing.

16    45.    In addition to the uniformity of rates, other facts suggest that it is more

17    plausible than not that rates have been set based on an agreement to fix prices.   In

18    theory, the chain of title should be documented back to its historic grant of

19    ownership centuries in the past.   Fear about a possible title defect in the distant past

20    is widely used as a justification by title agencies when convincing property buyers to

21    purchase an owner policy in addition to the lender policy, which is mandatory to

22    secure a mortgage.   The title agency, however, saves much time and money when the

23    search is limited to one or two transactions.   They rely on the insurance policy to

24    cover the remote chance of missing an earlier but still-valid claim.   On balance, the

25    expected cost of compensation in the cases in which a title defect materializes is

26    likely to be less than the sum of added overhead costs of routinely tracing back every

27    chain of title to the earliest registered owner in the distant past.

28

1    46.    Title insurance industry officials tend to justify the large proportion of
2    the premium retained by the title abstract and settlement agency (from 60 to more
3    than 90 percent) by the alleged high cost of title searching back into the distant past.
4    In fact, a high proportion of noncommercial properties are searched only through the
5    most recent transaction. No information is available as to what proportion of claims
6    originate in the distant past.

7    47.    Many U.S. homes are being resold three or four times in twenty-five
8    years. At each of these occasions, an abstract of title will be prepared on the basis of
9    a more or less thorough review of the available title records, inheritance records,
10    family records and records of past or current liens against a property.  It is
11    reasonable, therefore, to suspect that the risk of a title defect will decrease every time
12    a property is sold.

13    48.    Title searches have become less labor intensive, especially in large
14    urban counties and cities.  More and more of the information is available online. The
15    statistical likelihood that a title default would be overlooked is a closely held
16    industry secret, but it appears to be so small that many transactions are now insured
17    on the basis of a search of the last owner's title history or a search into transactions
18    that occurred during the last twenty-five to thirty-five years.

19    49.    The available  evidence strongly suggests that the title insurance
20    industry has achieved a remarkably low level of loss.  Yet, despite lowered risks of
21    loss and transaction costs, the defendants have not engaged in price competition at
22    the consumer level.

23    50.    There is a remarkable absence of rate changes by title insurers over the
24    past five years, despite declining costs of production, increased number of
25    transactions and increased revenue per transaction, during a period when costs per
26    unit of production declined significantly.  This failure to compete on price and
27    absence of material rate changes are indicia of an agreement not to compete based on
28    price.

1    51.    The title insurance market is highly concentrated - a few title insurers
2    account for the vast majority of title insurance sales - at both the statewide level and
3    at the county level in California. For example, three title insurer groups account for
4    77.4% of the market at a statewide level.  At the county level, each individual market
5    was highly concentrated.   Such a concentration enhances the ability of defendants to
6    fix prices

7                              **CLASS ACTION ALLEGATIONS**

8    52.    Plaintiff brings this action as a class action under rule 23(b)(3) of the
9    Federal Rules of Civil Procedure for violations of Section 1 of the Sherman Act, 15
10    U.S.C. § 1.  The Rule (b)(3) Class is comprised of all consumers who purchased title
11    insurance in California from defendants during the fullest period permitted by the
12    applicable statue of limitations.

13    53.    Plaintiff, along with all other members of the Rule (b)(3) Class, was
14    injured as a result of paying supracompetitive prices for title insurance in California.
15    These supracompetitive prices were achieved as a result of defendants' illegal price-
16    fixing activities.  Defendants are jointly and severally liable for the illegal price-
17    fixing activities alleged herein.

18    54.    Members of the (b)(3) Class include hundreds of thousands, if not
19    millions, of consumers.  Class members are so numerous that their joinder would be
20    impracticable.

21    55.    Plaintiff also brings this action as a class action under Rule 23(b)(2) of
22    the Federal  Rules of Civil Procedure, for violations of Section 1 of the Sherman Act,
23    15 U.S.C. § 1 and the California statutes.  The Rule (b)(2) Class includes all
24    members of the (b)(3) Class, and all consumers who are threatened with injury by the
25    anticompetitive conduct detailed herein.

26    56.    Defendants have acted, continued to act, refused to act and continued to
27    refuse to act on grounds applicable to the Rule (b)(2) Class, thereby making
28    appropriate final injunctive relief with respect to the Rule (b)(2) Class as a whole.

1   57.   Members of the Rule (b)(2) Class include hundreds of thousands, if not
2   millions, of consumers.  They are so numerous that their joinder would be
3   impracticable.

4   58.   Common questions of law and fact exist with respect to all Class
5   members and predominate over any questions solely affecting individual Class
6   members.  Among the questions of law or fact common to the class are the
7   following:

8       a.   Whether defendants have engaged in the alleged illegal price-
9            fixing activity;

10      b.   The duration and scope of defendants' alleged illegal price-fixing
11           activity;

12      c.   Whether defendants' alleged illegal price-fixing has caused
13           higher prices to plaintiff and other purchasers of title insurance in
14           California; and

15      d.   The extent to which defendants' unlawful activities artificially
16           inflated title insurance rates.

17   59.   Plaintiff does not have any conflict of interest with other Class
18   members.  Plaintiff's claims are typical of the claims of the Class and plaintiff will
19   fairly and adequately represent the interests of the Class.  Plaintiff has retained
20   counsel competent and experienced in class action and other complex litigation to
21   represent the Class.

22   60.   This action is superior to any other method for the fair and efficient
23   adjudication of this legal dispute since joinder of all members is not only
24   impracticable, but impossible.  The damages suffered by certain members of the
25   Class are small in relation to the expense and burden of individual litigation and
26   therefore it is highly impractical for such Class members to seek redress for damages
27   resulting from defendants' anticompetitive conduct.

28

15

1    61.    There will be no extraordinary difficulty in the management of the Class
2    action.

3                            **CAUSES OF ACTION**
4                    **AS AND FOR A FIRST CAUSE OF ACTION**
5          **AGAINST ALL DEFENDANTS FOR PER SE PRICE FIXING**
6          (Sherman Act Section I – *Per Se* Unlawful Horizontal Price-Fixing)

7    62.    Plaintiff repeats and realleges each and every allegation of this
8    complaint as if fully set forth herein.

9    63.    Defendants have entered into a continuing illegal contract, combination,
10   or conspiracy in restraint of trade, the purpose and effect of which is to fix and
11   maintain supracompetitive prices to consumers for title insurance in California and
12   elsewhere.  This contract, combination, and conspiracy is illegal *per se* under Section
13   1 of the Sherman Act, 15 U.S.C. § 1.

14   64.    Defendants' contract, combination, or conspiracy is comprised of
15   defendants' efforts and agreement to (i) collectively fix uniform and
16   supracompetitive rates for title insurance in California and other states; (ii) include in
17   their calculated rates agency commission costs; (iii) embed within these costs
18   payoffs, kickbacks, and other charges to title agents that are unrelated to the issuance
19   of title insurance; (iv) hide these supposed costs from regulatory scrutiny by
20   funneling them to and through title agents; and (v) agree, either expressly or tacitly,
21   not to compete on premium rates for title insurance in the State of California.

22   65.    Defendants' contract, combination, or conspiracy has caused substantial
23   anticompetitive effects in the title insurance market.  It has done so by causing
24   plaintiff, and other purchasers of title insurance in California, to pay significantly
25   more for title insurance than they would have in the absence of defendants' illegal
26   activity.

27
28

16

66.    As a result of these violations of Section 1 of the Sherman Act, plaintiff and the purported Class have been injured in their business and property in an amount not presently known, but which is, at a minimum, millions dollars, prior to trebling.

67.    Such violations and the effects thereof are continuing and will continue unless injunctive relief is granted.  Plaintiff has no adequate remedy at law.

## AS AND FOR A SECOND CAUSE OF ACTION

### AGAINST ALL DEFENDANTS FOR VIOLATION OF CAL. BUS. AND PROF. CODE §§ 16720 *ET SEQ.*

68.    Plaintiff repeats and realleges each of his allegations as though fully set forth herein.

69.    Defendants' conduct  as set forth above is in violation of the Cartwright Act of California (Cal. Bus. & Prof. Code §§ 16720, *et seq.*).

70.    As a direct result of defendants' unlawful acts plaintiff and members of the Class have paid artificially inflated prices for title insurance and have suffered injury to their business and property.

## AS AND FOR A THIRD CAUSE OF ACTION

### AGAINST ALL DEFENDANTS FOR VIOLATION OF CAL. BUS. AND PROF. CODE §§ 17200 *ET SEQ.*

71.    Plaintiff repeats and realleges each of his previous allegations as though fully set forth herein.

72.    Defendants' statements and representations constitute unfair, unlawful and deceptive trade practices in violation of the UCL, Bus. & Prof. Code §§ 17200, *et seq.*

73.    All of the wrongful conduct alleged herein occurred and continues to occur in the conduct of defendants' business.   Defendants' wrongful conduct is part of a pattern or generalized course of conduct that is repeated in the State of California on hundreds, if not thousands, of occasions daily.

17

1    74.    Plaintiff has suffered injury in fact and has lost money or property as a
2  result of defendants' unfair, unlawful and/or deceptive practices by paying a higher
3  price for title insurance then he would or should have absent the conduct complained
4  of.

5    75.    Plaintiff requests that this Court enter such orders or judgment as may
6  be necessary to enjoin the defendants from continuing its unfair, unlawful, and/or
7  deceptive practices, to restore to any person in interest any money which may have
8  been acquired by means of such unfair competition and to disgorge any profits
9  realized by defendants as a result of their unfair, unlawful and/or deceptive practices,
10  as provided in Cal. Bus. & Prof. Code § 17203 and Cal. Civ. Code § 3345, and for
11  such other relief as set forth in the Prayer for Relief.

**AS AND FOR A FOURTH CAUSE OF ACTION**

**FOR UNJUST ENRICHMENT**

15    76.    Plaintiff incorporates by reference the preceding allegations.
16    77.    This Cause of Action is pled in the alternative to all claims and/or
17  causes of action at law.
18    78.    Defendants have received a benefit from plaintiff and the Class
19  members in the form of the prices plaintiff and the Class members paid for
20  defendants' title insurance.
21    79.    Defendants are aware of their receipt of the above-described benefit.
22    80.    Defendants received the above-described benefit to the detriment of
23  plaintiff and other members of the Class.
24    81.    Defendants continue to retain the above-described benefit to the
25  detriment of plaintiff and the Class members.
26    82.    As a result of defendants' unjust enrichment, plaintiff and the Class
27  members have sustained damages in an amount to be determined at trial and seek full
28  disgorgement and restitution

18

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26    ///
27    ///
28    ///

## **DEMAND FOR JURY TRIAL**

83.    Plaintiff demands a trial by jury of all issues so triable.

## **PRAYER FOR RELIEF**

WHEREFORE, plaintiff and the Class request the following relief:

A.    That the Court determine that this action is a proper class action, certifying plaintiff as a class representative under Rule 23 of the Federal Rules of Civil Procedure and plaintiff's counsel as class counsel;

B.    That the Court declare, adjudge, and decree that defendants have committed the violations of federal law alleged herein;

C.    That defendants, their directors, officers, employees, agents, successors, and assigns be permanently enjoined and restrained from, in any manner, directly or indirectly, unlawfully fixing or maintaining their title insurance rates at supracompetitive levels, and committing any other violations of Section 1 of the Sherman Act, the California Statutes, and/or of other laws having a similar purpose and effect;

D.    That the Court award damages sustained by Class members from defendants' violations of Section 1 of the Sherman Act in an amount to be proven at trial, to be trebled according to law, plus interest (including prejudgment interest), to compensate them for the overcharges they incurred;

1    E.    That the Court award the Class attorneys' fees and costs of suit , and

2          grant such other and further relief as the Court may deem just and

3          proper.

4

5    Dated: April 23, 2008                    Michael D. Braun
                                              BRAUN LAW GROUP, P.C.
6
                                       By:
7                                             Michael D. Braun
                                              12304 Santa Monica Blvd., Suite 109
8                                             Los Angeles, CA 90025
                                              Tel:    (310) 442-7755
9                                             Fax:    (310) 442-7756
                                              E-mail:  service@braunlawgroup.com
10
                                              **Liaison Counsel for Plaintiff**
11
                                              Loren Kieve
12                                            KIEVE LAW OFFICES
                                              50 California Street, Suite 1500
13                                            San Francisco, CA 94111
                                              Tel:    (415) 364-0060
14                                            Fax:    (415) 439-5377
                                              E-mail: lk@kievelaw.com
15
                                              Christopher J. Gray
16                                            LAW OFFICE OF CHRISTOPHER J. GRAY,
                                              P.C.
17                                            460 Park Avenue, 21ST Floor
                                              New York, NY 10022
18                                            Tel:    (212) 838-3221
                                              Fax:    (212) 508-3695
19                                            E-mail: gray@cjgraylaw.com

20                                            Krishna B. Narine
                                              LAW OFFICE OF KRISHNA B. NARINE
21                                            2600 Philmont Avenue
                                              Huntingdon Valley, PA 19006
22                                            Tel:    (215) 914-2460
                                              Fax:    (215) 914-2462
23                                            E-mail: knarine@kbnlaw.com

24                                            Louis F. Burke
                                              E-mail: lburke@lfblaw.com
25                                            Leslie Wybiral
                                              E-mail: ewybiral@lfblaw.com
26                                            LOUIS F. BURKE, P.C.
                                              460 Park Avenue, 21ST Floor
27                                            New York, NY 10022
                                              Tel:    (212) 682-1700
28                                            Fax:    (212) 808-4280

                                      20

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Samuel D. Edwards
E-mail: sedwards@sselaw.com
Kirk G. Smith
E-mail: ksmith@sselaw.com
SHEPHERD SMITH & EDWARDS LLP
1010 Lamar Street, Suite 900
Houston, TX 77002
Tel:  (713) 227-2400
Fax:  (713) 227-7215

**Counsel for Plaintiff**

COPY

Michael D. Braun (167416)
BRAUN LAW GROUP, P.C.
12304 Santa Monica Blvd., Suite 109
Los Angeles, CA 90025
Tel: (310) 442-7755; Fax: (310) 442-7756
E-mail: service@braunlawgroup.com

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| DR. RAJNIKANT KOTHARI, on Behalf of Himself,<br><br>PLAINTIFF(S)<br><br>v.<br><br>FIRST AMERICAN TITLE INSURANCE COMPANY, (SEE ATTACHMENT A)<br><br>DEFENDANT(S). | CASE NUMBER<br><br>SACV08-00440 DOC (RNBx)<br><br><br>**SUMMONS** |

TO:    DEFENDANT(S): <u>SEE ATTACHMENT B</u>

A lawsuit has been filed against you.

Within __20__ days after service of this summons on you (not counting the day you received it), you must serve on the plaintiff an answer to the attached ☑ complaint ☐ _____ amended complaint ☐ counterclaim ☐ cross-claim or a motion under Rule 12 of the Federal Rules of Civil Procedure.   The answer or motion must be served on the plaintiff's attorney, <u>Michael D. Braun</u>, whose address is <u>12304 Santa Monica Blvd., Suite 109 Los Angeles, CA 90025; (SEE ATTACHMENT C)</u>. If you fail to do so, judgment by default will be entered against you for the relief demanded in the complaint.  You also must file your answer or motion with the court.

Clerk, U.S. District Court

APR 2 3 2008

Dated: _____

By: _____

**ROLLS ROYCE PASCHAL**

Deputy Clerk

(Seal of the Court)

1144

*[Use 60 days if the defendant is the United States or a United States agency, or is an officer or employee of the United States.  Allowed 60 days by Rule 12(a)(3)].*

## ATTACHMENT A TO SUMMONS

FIDELITY NATIONAL TITLE INSURANCE COMPANY, CHICAGO TITLE
INSURANCE COMPANY, TICOR TITLE INSURANCE COMPANY,
FIDELITY NATIONAL FINANCE, INC., UNITED GENERAL TITLE
INSURANCE COMPANY, FIRST AMERICAN CORPORATION,
COMMONWEALTH LAND TITLE INSURANCE COMPANY, LAWYERS
TITLE INSURANCE CORPORATION, LANDAMERICA FINANCIAL
GROUP, INC., STEWART TITLE GUARANTY COMPANY, and STEWART
TITLE INSURANCE COMPANY,

Defendants.

## ATTACHMENT B TO SUMMONS

FIRST AMERICAN TITLE INSURANCE COMPANY, FIDELITY NATIONAL
TITLE INSURANCE COMPANY, CHICAGO TITLE INSURANCE
COMPANY, TICOR TITLE INSURANCE COMPANY, FIDELITY NATIONAL
FINANCE, INC., UNITED GENERAL TITLE INSURANCE COMPANY, FIRST
AMERICAN CORPORATION, COMMONWEALTH LAND TITLE
INSURANCE COMPANY, LAWYERS TITLE INSURANCE CORPORATION,
LANDAMERICA FINANCIAL GROUP, INC., STEWART TITLE GUARANTY
COMPANY, and STEWART TITLE INSURANCE COMPANY,

Defendants.

# ATTACHMENT C TO SUMMONS

Loren Kieve
KIEVE LAW OFFICES
50 California Street, Suite 1500
San Francisco, CA 94111
Tel:   (415) 364-0060
Fax:   (415) 439-5377
E-mail:  lk@kievelaw.com

Christopher J. Gray
LAW OFFICE OF CHRISTOPHER J. GRAY, P.C.
460 Park Avenue, 21ST Floor
New York, NY 10022
Tel:   (212) 838-3221
Fax:   (212) 508-3695
E-mail:  gray@cjgraylaw.com

Krishna B. Narine
LAW OFFICE OF KRISHNA B. NARINE
2600 Philmont Avenue
Huntingdon Valley, PA 19006
Tel:   (215) 914-2460
Fax:   (215) 914-2462
E-mail: knarine@kbnlaw.com

Louis F. Burke
E-mail: lburke@lfblaw.com
Leslie Wybiral
E-mail:  ewybiral@lfblaw.com
LOUIS F. BURKE, P.C.
460 Park Avenue, 21ST Floor
New York, NY 10022
Tel:   (212) 682-1700
Fax:   (212) 808-4280

Samuel D. Edwards
E-mail:  sedwards@sselaw.com
Kirk G. Smith
E-mail:  ksmith@sselaw.com
SHEPHERD SMITH & EDWARDS LLP
1010 Lamar Street,  Suite 900
Houston, TX 77002
Tel:   (713) 227-2400
Fax:   (713) 227-7215

**Counsel for Plaintiff**